**Robert BUTRICK, Respondent,**

v.

**PETERBILT OF SPRINGFIELD, INC., Appellant,**

and

**Division of Employment Security, Respondent.**

No. SD 31251.

Missouri Court of Appeals, Southern District, Division One.

Jan. 30, 2012.

Motion for Rehearing or Transfer Denied Feb. 21, 2012.

Rick E. Temple, Springfield, MO, for Appellant.

Leah Williamson, Jefferson City, for Respondent.

ROBERT S. BARNEY, Judge.

Peterbilt of Springfield, Inc. ("Employer") appeals from the Labor and Industrial Relations Commission's ("the Commission") "Order" adopting the decision of the Appeals Tribunal which had determined that Robert Butrick ("Claimant") was not disqualified from receiving unemployment compensation benefits following his termination from Employer.[1] In its sole point relied on, Employer asserts the Commission erred in concluding Claimant was not disqualified from unemployment compensation benefits because the evidence showed he was discharged for misconduct connected to work in that he "was driving Employer's truck above the legal speed limit, after being previously instructed and warned by ... Employer that this was prohibited." We reverse the decision of the Commission.

Claimant was hired on November 26, 2007, as a parts delivery driver for Employer and his route included both in-town and out-of-town stops. He was terminated from employment on September 14, 2010, due to "multiple warnings of ... speeding or vehicle abuse." Claimant then filed his initial request for compensation and Employer protested the claim. The Division

issued its "Deputy's Determination Concerning Claim for Benefits" which found Claimant was disqualified from receiving unemployment benefits because "he was discharged by ... Employer ... for misconduct connected with work." The Deputy's determination specifically found Claimant "was discharged because he was driving carelessly and aggressively while making a delivery in a company truck. [Claimant] was previously instructed that this was prohibited." Claimant appealed the Deputy's determination and on December 3, 2010, a hearing was held before the Appeals Tribunal.

At the hearing, Richard Dorsey ("Mr. Dorsey"), the "Parts Manager" for Employer, testified that Employer is a "a truck sales company, parts service, sales." He related Employer always stressed the importance of safety and compliance with the laws with its drivers and took the position that the drivers should not engage in "careless driving" or "speeding. . . ." He stated that Employer's drivers are told "to drive the speed limit and not to go over it."

Mr. Dorsey detailed the fact that Claimant was disciplined several times during his employment with Employer for "his driving or issues relating to his driving."

First, Mr. Dorsey discussed an incident that occurred on September 18, 2009, and a copy of an "EMPLOYEE WARNING NOTICE" was received into evidence. The warning notice, which indicated it was being issued for "carelessness," stated that on that date an "individual called in complaining about the way [Claimant] was driving that he almost ran him off the road ... individual actually turned around and followed [Claimant] to see where he went." The notice related that "[a]ny further inci-

---

1. The Division of Employment Security ("the Division") also appears in this appeal as a Respondent.

dents would result in additional discipline up to and including dismissal. We must operate safely on the streets and highways. We are never in such a hurry that safety is not [first and] foremost." Although Claimant signed the notice, he noted on the form that he did not agree "with Employer's description of [the] violation."

Second, Mr. Dorsey also testified that five days after the first warning notice Claimant received a second warning. This second notice was issued on September 23, 2009, informing Claimant of his "carelessness" and explained that Claimant "backed into a customer truck while moving a parts pickup causing damage to [Employer's] truck...." The consequence of Claimant's action was set out as "[f]urther disciplining up to and including dismissal." This second notice was signed by Claimant and he acknowledged on the face of the document that he agreed with Employer's statement.

Third, Mr. Dorsey explained that Claimant then received an additional warning notice on February 12, 2010, after receiving "a speeding ticket driving 49 mph in a 35 mph speed zone. [Claimant] said a lady was driving slowly in front of him and he passed her." The form set out: "[w]e have discussed in previous warnings about the importance of driving safely when in our company trucks. Any further incidents including but not limited to speeding, accidents, public calls regarding driving practices or carelessness while behind the wheel will not be tolerated and [will] result in termination." This third notice was signed by Claimant and he again indicated on the face of the document that he agreed with Employer's statement.

Fourth, Mr. Dorsey testified that on September 13, 2010, he received a voicemail from a citizen that "[s]aid she was traveling south on [Highway] 65, and one of our pickups was driving recklessly and ... in excess of the speed limit, fast

enough that she could not get the identification off the pickup." Wanting to know the identity of the driver, Mr. Dorsey went "to a satellite system that [Employer has] in each of [its] trucks that ... monitors speed, efficiency of the vehicle, idle times, fuel mileage ..." and discovered that Claimant's "truck was, at the specific time, 10:50 a.m. that she gave [him] on the phone ...," the only truck in the vicinity of the complaint. Mr. Dorsey identified a printout from Employer's satellite system which showed that between 10:50 a.m. and 10:54 a.m. Claimant's truck was traveling at 75 mph south on Highway 65 in an area where the speed limit was either 60 or 65 mph. A fourth warning notice was prepared detailing the aforementioned incident and noting a violation for "insubordination." This warning also referenced Claimant's three prior warnings and set out that the consequence for this violation was dismissal. Claimant neither agreed with Employer's description of the violation nor did he sign it. Mr. Dorsey explained Claimant was terminated due to "[m]ultiple warnings of ... speeding or vehicle abuse," "[n]ot following the rules of the road," "[s]afety issues," and Employer's receipt of phone calls from members of the public about his driving. Mr. Dorsey related that in their mutual discussions Claimant denied driving carelessly on September 13, 2010, but admitted to speeding.

An "EXIT INTERVIEW" form was prepared by Mr. Dorsey relative to Claimant's termination. It stated Claimant was being involuntarily terminated for "Violation of Company Policy" and this form was signed by Claimant.

Regarding the Employer's satellite monitoring system, Mr. Dorsey testified it had been operating for four years and had an alert mechanism that could be set to alert him when a driver went over a certain speed. He related he typically set the

alert on the system to notify him via e-mail when a driver went over the speed of 70 mph because many of the drivers "run on interstates." He related that as a rule when he received an alert that a driver was exceeding the speed limit he would give a copy of that alert to the driver to call the driver's attention to it. He also related he notified Claimant of alerts on his speed on seven different occasions between April 4, 2010, and August 25, 2010, and each of those times Claimant had been traveling "about 75 miles per hour...." Mr. Dorsey did add that there was somewhat of a "cushion" applied when dealing with the speed alerts. He stated that "if you're going south on [Highway] 65, say in this case, if you are in the Branson area, the hills are pretty large up and down. A truck will coast and go over, you know, some speed limit there, so we give them that leniency." He also related he was sure Claimant knew about the cushion and often the various drivers would explain that they were going downhill when confronted with a speed alert from the satellite system. Mr. Dorsey was adamant that any "cushion" did not infer that Employer approved of its drivers speeding; it related only to the speed alerts; and Employer expected its drivers to "follow the law and follow the speed limit." He stated he trusted the satellite company to keep the system accurate but could not personally vouch for its accuracy.

Claimant testified "[t]here w[ere] a few times ..." Mr. Dorsey directly discussed speeding with him, but he did not recall the issue ever being addressed at any of the meetings held with the drivers. He related he never received a "driver handbook" from Employer. Claimant acknowledged he was notified several times that he had triggered the speed alert on the satellite system and that none of the notices were for going less than 76 miles an hour. After each of these warnings, Mr.

Dorsey spoke with Claimant about it and told him to "watch out" and "slow down." He stated Mr. Dorsey spoke to him about a "cushion that drivers had" and advised him that they "[m]ight be able to do a little—five miles an hour [over], but that was about it." He admitted that on the day of his final warning he had been traveling south on highway 65 and it was "possible" he was speeding although he did not "know." He also related the speed limit on that roadway is between 60 and 65 mph and at no time was the speed limit 70 mph. When Mr. Dorsey met with him to terminate his employment, Claimant "was surprised that he would take the word of somebody calling in over [him] ...," and stated to Mr. Dorsey that he denied driving carelessly on that occasion. He also related he could not remember if he admitted to speeding or not. He acknowledged he had never been given permission to speed by Employer, and specifically acknowledged being told that Employer "didn't want [its drivers] to speed." He stated he was not sure if he was terminated for possibly speeding or because of the phone call from the citizen.

The Appeals Tribunal issued its decision on December 10, 2010. In its decision, the Appeals Tribunal made the following findings of fact:

[C]laimant's version of the circumstances surrounding the separation did not exactly match that of [E]mployer. However, the Tribunal specifically finds that [C]laimant's version was more credible since some of [E]mployer's testimony consisted of hearsay and since there was no evidence that [E]mployer's [satellite] fleet tracking system was accurate.

[C]laimant was aware of [E]mployer's policies and procedures. [C]laimant had received written warning on September 18, 2009, for another complaint from a

citizen, on September 23, 2009, for a minor accident and on February 12, 2010, for receiving a summons for speeding.

As such, applying the facts to the law, the Appeals Tribunal found:

> [E]mployer had a policy where drivers were required to operate their vehicles in a safe and prudent manner. This policy was reasonable because to do otherwise could expose [E]mployer to liability. [C]laimant was aware of the policy. [C]laimant then admitted to speeding on September 13, 2010. However, reviewing courts have consistently held that speed alone does not equate to recklessness. Additionally, drivers were allowed a cushion of approximately five miles per hour, and there is no competent evidence to show that [C]laimant exceeded that cushion. While [E]mployer may have had good cause to discharge [C]laimant if it believed the anonymous caller, the [E]mployer has not met its burden of proof to show misconduct as defined in [s]ection 288.030.1(23), RSMo [Cum.Supp.2006].

> The Appeals Tribunal concludes that [C]laimant was discharged on September 14, 2010, but not for misconduct connected with his work.

Accordingly, the Appeals Tribunal reversed the decision of the Deputy.

 Employer timely filed its "APPLICATION FOR REVIEW" on January 7, 2011. On March 14, 2011, the Commission issued its "Order of Commission Affirming Appeals Tribunal" in which it adopted the decision of the Appeals Tribunal.[2] This appeal by Employer followed.

In its sole point relied on Employer maintains the Commission erred in finding Claimant was not disqualified from receiving unemployment compensation benefits. Specifically, it asserts there was competent and substantial evidence that Claimant was "discharged for 'misconduct connected with work' in that [he] was driving ... Employer's truck above the legal speed limit, after being previously instructed and warned by ... Employer that this was prohibited."

 "The purpose of unemployment compensation laws is to benefit persons unemployed through no fault of their own.'" *Scrivener Oil Co., Inc. v. Crider,* 304 S.W.3d 261, 267 (Mo.App.2010) (quoting *Simpson Sheet Metal, Inc. v. Labor & Indus. Rel. Comm'n of Mo.,* 901 S.W.2d 312, 314 (Mo.App.1995)). " 'Disqualifying provisions of the unemployment compensation law are to be construed against the disallowance of benefits to unemployed but available workers.'" *Id.* at 268 (quoting *Simpson,* 901 S.W.2d at 314).

 "This Court's review of the Commission's decision in an unemployment compensation case is governed by both Article 5, Section 18 of the Missouri Constitution and section 288.210"[3] of the Missouri statutes. *Ragan v. Fulton State Hosp.,* 188 S.W.3d 473, 474 (Mo.App.2006). In our review, we

> may modify, reverse, remand for rehearing, or set aside the decision of the Commission only where: (1) the Commission acted without or in excess of its powers; (2) the decision was procured by fraud; (3) the facts found by the Commission do not support the award; or (4) there was no sufficient competent

---

2. "[W]hen reviewing the order of the Commission, this Court examines the decision of the Appeals Tribunal." *Murphy v. Aaron's Auto. Prods.,* 232 S.W.3d 616, 619 (Mo.App. 2007).

3. Unless otherwise stated, all statutory references are to RSMo 2000.

evidence in the record to warrant the making of the award.

*Ayers v. Sylvia Thompson Res. Ctr.,* 211 S.W.3d 195, 197–98 (Mo.App.2007); § 288.210. "The findings of the [C]ommission as to the facts, if supported by competent and substantial evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of the appellate court shall be confined to questions of law." § 288.210. If "there was no sufficient competent evidence in the record to warrant the making of the award[,]" then the decision of the Commission may not stand. § 288.210(4). " 'In determining whether competent and substantial evidence was presented, we examine the evidence in the record as a whole.' " *Keaweehu v. 7–Eleven, Inc.,* 334 S.W.3d 666, 671 (Mo.App.2011) (quoting *Freeman v. Gary Glass & Mirror, L.L.C.,* 276 S.W.3d 388, 391 (Mo.App.2009)).

■ This Court also "reviews questions of law *de novo* " and the "issue of whether an employee's actions constitute misconduct related with work is a question of law...." *Freeman,* 276 S.W.3d at 391. " 'In reviewing the Commission's decision, this Court is not bound by the Commission's conclusions of law or its application of the law to the facts.' " *Buckley v. Safelite Fulfillment, Inc.,* 299 S.W.3d 757, 760 (Mo.App.2009) (quoting *Difatta–Wheaton v. Dolphin Capital Corp.,* 271 S.W.3d 594, 595 (Mo. banc 2008)).

■ Section 288.050.2, RSMo Cum. Supp.2006, disqualifies a claimant from receiving unemployment compensation benefits if the claimant was discharged for misconduct. Section 288.030.1(23), RSMo Cum.Supp.2006, sets out that "misconduct" is

an act of wanton or willful disregard of the employer's interest, a deliberate violation of the employer's rules, a disregard of standards of behavior which the employer has the right to expect of his or her employee, or negligence in such degree or recurrence as to manifest culpability, wrongful intent or evil design, or show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer....

"Work-related misconduct requires a willful violation of the employer's rules or standards, and the violation must be intended." *Robinson v. Courtyard Mgmt. Corp.,* 329 S.W.3d 736, 740 (Mo.App.2011). "Willful is defined as proceeding from a conscious motion of the will; voluntary; knowingly, deliberate; intending the result which actually comes to pass; designed; intentional; purposeful; not accidental or involuntary.' " *Lightwine v. Republic R–III School Dist.,* 339 S.W.3d 585, 590 (Mo. App.2011) (quoting *Murphy,* 232 S.W.3d at 621). Saliently, even " '[a] single instance of intentional disobedience of an employer's directive can constitute misconduct.' " *Noah v. Lindbergh Inv., LLC,* 320 S.W.3d 212, 216 (Mo.App.2010) (quoting *Finner v. Americold Logistics, LLC,* 298 S.W.3d 580, 584 (Mo.App.2009)). Further, " '[t]here is a Vast distinction' between the violation of a rule of an employer that would justify the discharge of the employee and a violation of such rule that would warrant a determination of misconduct connected with the employee's employment so as to disqualify him for unemployment compensation benefits.' " *Scrivener,* 304 S.W.3d at 268 (quoting *McClelland v. Hogan Pers., LLC,* 116 S.W.3d 660, 665 (Mo.App. 2003)). Employer "bears the burden of proving misconduct by substantial and competent evidence." *Robinson,* 329 S.W.3d at 740.

■ Here, the competent and substantial evidence upon the whole record reveals the Commission's decision was in error. Claimant's position with Employer required him to operate Employer's vehicles

and drive many miles every single work day. Employer made it clear to Claimant that he was to obey all traffic laws in his operation of said vehicles and that he was not to exceed the speed limit in performing his occupational duties. Claimant admitted Employer spoke directly to him on several occasions regarding his propensity to speed and made it clear to him that he needed to keep his speed at the legal maximum. Claimant admitted Employer made him aware each time the satellite monitoring system showed that he had exceeded the speed limit. Claimant and Employer both testified as to the three written warnings Claimant had received from Employer for his driving habits. One of the warnings clearly set out that Employer's employees "must operate safely on the streets and highways. We are never in such a hurry that safety is not [first and] foremost." Each of the first three warnings received by Claimant informed him that he was subject to dismissal for further driving violations. In fact, the third warning stated: "[w]e have discussed in previous warnings about the importance of driving safely when in our company trucks. Any further incidents including but not limited to speeding, accidents, public calls regarding driving practices or carelessness while behind the wheel will not be tolerated and [will] result in termination." This third warning notice was signed by Claimant and he acknowledged on the face of the document that he agreed with Employer's statement.

It was seven months later, on September 13, 2010, that Mr. Dorsey received the phone call from a member of the public reporting one of Employer's vehicles was driving recklessly and that truck was traced back by Employer to Claimant. Mr. Dorsey also testified that the satellite monitoring system showed Claimant was the only truck owned by Employer in that area at the time of the phone call. The

satellite monitoring system also revealed Claimant had been operating his vehicle at 10 to 15 mph over the speed limit around the same time as the complaint and even throughout that entire day. Claimant testified that while he did not "know" how fast he was going that day and it was "possible" he was speeding. Claimant admitted he had never previously questioned the accuracy of the satellite monitoring system, despite the fact that he had three previous written warnings and at least seven notifications that he had been speeding.

The Commission specifically found that Claimant "admitted to [Employer] that he may have been speeding" on September 13, 2010; that Claimant "was aware of [Employer's] policies and procedures;" that Claimant received written warnings for speeding on September 18, 2009, and on February 12, 2010; and that Claimant received a written warning for a minor accident on September 23, 2009. All of these findings are supported by substantial and competent evidence in the record.

However, it appears to this Court that the Commission thereafter erred when it concluded Employer did not meet its burden to prove misconduct because "drivers were allowed a cushion of approximately five miles per hour, and there is no competent evidence to show that [C]laimant exceeded that cushion." There was no competent evidence upon which the Commission could make such a factual finding. All of the evidence in the record, including Claimant's own testimony, was that Employer did not condone speeding by its employees. The cushion referenced by the Commission was an administrative reporting mechanism used by Employer in keeping track of its employees. It was not a company policy of tolerance for relatively minor speeding infractions.

The Commission further erred when it concluded Employer did not prove miscon-

duct because it found no competent evidence "concerning exactly how fast" Claimant was traveling. The Commission found that Claimant's testimony relating to what occurred on September 13, 2010, was more credible because "some of [Employer's] testimony consisted of hearsay [, the anonymous message left on Mr. Dorsey's voicemail,] and since there was no evidence that [Employer's satellite] fleet tracking system was accurate." Even when we accept such credibility determinations, the Commission's conclusion does not logically flow from the facts it found to be true. The Commission found that Claimant was speeding on September 13, 2010, and that such a violation was clearly a dismissible offense based on his previous three written warnings. Claimant's failure to adhere to the traffic laws of the State of Missouri despite several documented incidents together with repeated discussions with Mr. Dorsey can certainly be considered intentional and willful violations of company policy. This repeated pattern of "safety violations revealed a pattern of recurrent negligent behavior that constituted misconduct." *Finner*, 298 S.W.3d at 584.

The Commission's decision was not supported by competent and substantial evidence and it erred as a matter of law in finding Claimant was not disqualified from receiving unemployment compensation benefits. *See Buckley v. Safelite Fulfillment, Inc.*, 299 S.W.3d 757, 762 (Mo.App. 2009). Employer's point has merit.

Therefore, we reverse the decision of the Commission and remand to the Commission with instructions to reinstate and adopt the original Deputy's determination dated October 26, 2010.

BATES and SCOTT, JJ., concur.