

# Missouri Court of Appeals

## Southern District

### Division Two

TAMKO BUILDING PRODUCTS, INC., )
)
       Employer-Appellant, )
)
v. )
)
DANIEL PICKARD, ) No. SD33025
) Filed: 9-24-14
       Claimant-Respondent, )
)
and MISSOURI DIVISION OF )
EMPLOYMENT SECURITY, )
)
       Respondent. )

### APPEAL FROM THE LABOR AND INDUSTRIAL RELATIONS COMMISSION

### **AFFIRMED**

Tamko Building Products, Inc. (Employer) appeals from a decision by the Labor and Industrial Relations Commission (Commission) awarding unemployment benefits to Daniel Pickard (Employee). The Commission determined that Employee was not disqualified from receiving unemployment benefits because his discharge was not for misconduct connected with work. *See* § 288.050.2.[1] In a single point relied on, Employer contends the Commission erred in its determination because the facts found by

---

[1] All statutory references are to RSMo Cum. Supp. (2012) unless otherwise specified.

the Commission do not support the award and/or the award was not supported by sufficient competent evidence in the record. We disagree and affirm.

**Standard of Review**

Review of the Commission's decision is governed by constitutional provision and by statute. *Finner v. Americold Logistics, LLC*, 298 S.W.3d 580, 581 (Mo. App. 2009). The Missouri Constitution directs this Court to determine whether the Commission's decision is "authorized by law" and whether it is "supported by competent and substantial evidence upon the whole record." MO. CONST. art. V, § 18; *Finner*, 298 S.W.3d at 581. Pursuant to § 288.210 RSMo (2000), we may modify, reverse, remand for rehearing, or set aside the decision of the Commission only where, *inter alia*, the facts found by the Commission do not support the award, or there was not sufficient competent evidence in the record to warrant the making of the award. *Id*.; *see Seck v. Department of Transp.*, 434 S.W.3d 74, 78 (Mo. banc 2014). In reviewing the Commission's factual findings, § 288.210 further requires that this Court must: "(1) defer to the Commission's credibility determinations and, (2) in the absence of fraud, accept all factual determinations made by the Commission that are supported by the evidence on the record as a whole." *Seck*, 434 S.W.3d at 79; § 288.210 RSMo (2000).

"In determining whether the Commission's decision is authorized by law, we are not bound by its conclusions of law or its application of law to the facts." *Finner*, 298 S.W.3d at 581. While we defer to the Commission on issues of credibility and weight of the evidence, the issue of whether an employee's actions constitute misconduct related with work is a question of law, which we review *de novo*. *Seck*, 434 S.W.3d at 78; *Fendler v. Hudson Services*, 370 S.W.3d 585, 588-89 (Mo. banc. 2012).

2

In general, a claimant bears the burden of demonstrating that he is entitled to unemployment benefits. *Fendler*, 370 S.W.3d at 589. When the employer claims that the claimant was discharged for misconduct, however, the burden shifts to the employer to prove misconduct connected to work by a preponderance of the evidence. *Id*.; *see Seck*, 434 S.W.3d at 82.

**Factual and Procedural Background**

Employer manufactures building products. In April 1994, Employee was hired by Employer to operate a forklift and monitor a palletizer machine for a production line at Employer's High Street facility (the facility) in Joplin. In March 2013, nearly 19 years later, Employee was terminated for violating safety rules. A deputy of the Division of Employment Security initially determined that Employee was disqualified from unemployment benefits because he was discharged for misconduct connected with his work. Employee appealed that determination, and a hearing was held before the Appeals Tribunal in April 2013. Testimony was received from Employee and Matt Parrish (Parrish), Employer's assistant general manager at the facility.

Parrish gave the following testimony. Until approximately 2007, safety was not a priority at the facility. "[I]f someone got hurt that was deemed okay or a part of the process as long as we got production out the door." That changed in 2007. Employer implemented a safety policy that included the Uniform Safety Conduct Standard (USCS). The USCS categorizes safety violations on the basis of severity so that more dangerous violations result in a higher assessment of points. Under this system, an employee may

be terminated if he accumulates 40 or more points. Employee underwent training on the USCS and understood the consequences of working in an unsafe manner.[2]

Employee gave the following testimony. He had worked for Employer since 1994. In the early morning hours of February 26, 2013, Employee was working his production line, which is one of two production lines at the facility. Each line has a forklift driver. When a driver goes on break, the other driver is expected to work both lines. Rolls of roofing felt advance down a conveyor belt along each line to an accumulator table. The table lifts the rolls, turns them and stacks them vertically onto a pallet where they are stretch-wrapped for shipping. There was a perimeter safety fence separating an employee from the production line. Inside the fence, there was an elevated walkway on which an employee would stand to unclear any jams. An employee would use a safety gate to access the walkway. The gate was equipped with an electric eye that stopped the conveyor belt.

Around 2:30 a.m., Employee was working both lines alone because the other driver was on break. There had been upset conditions on both lines that night. A roll of roofing felt got lodged along the other driver's line, which prevented other rolls from advancing. Employee stepped over the safety fence, removed his hard hat and covered the electric eye with his hard hat to prevent the line from shutting down. Employee then reached over the accumulator table, quickly dislodged the roll of roofing felt so that production could continue and returned to work on his line. The incident was recorded

---

[2] Employee signed a USCS Training Acknowledgment stating the he understood USCS standardized consequences for working in an unsafe manner. This acknowledgment was part of several documents admitted in evidence concerning Employer's safety policies and procedures.

on a video at the facility.[3]  Employee testified that he responded to the jam the way he had been trained to react when he was hired in 1994:

> [W]hen I started there wasn't none of this stuff. That's how I was trained when I started. You got a problem with machine, that's before all the new safety, you know, came up. You put your hat on that [e]ye, and usually I have a hook there where you can grab the roll and, in fact, a guy six foot two or three could do basically the same thing I could do by standing right here, he could reach across. As you notice I did not stand on this accumulator table, there's a little catwalk on this side. I wasn't in the line of fire of anything …. That was – when [I] started that's how we did that. You could walk right up underneath the thing. You could, you know, if you had trouble you'd put your hat on the eye then you straighten the roll, took your hat off and went on. So, none of that fence was there. I know that's irrelevant to all of this but none of it was there and that, you know, I've done – everybody did that for years that's how I was trained to do that when I came in, you know, cause you could walk right up to it, stand under it, you know.

Employee also was covering both production lines that night due to a lack of personnel to watch each production line:

> [There were] upset conditions on both lines that night ….  That's another thing, a shortage of people back there. We have to start covering to go to breaks, you know. So, I was trying to cover both lines. That wasn't even my machine, the guy was on break that runs that machine and we were having trouble with drivers coming along from both lines so I was, you know, and I made a wrong decision. I didn't sit there and plot it, I just did it. I mean I didn't sit there and I – I'm on break or – I'm not like that. I believe in safety too. I didn't get in the path where I was going to get hurt, you know.

Additionally, Employee was standing in the same spot where employees were routinely stationed while the line was running when certain products were being produced:

> I understand the safety policy, but there's two certain products we run that you guys know we station people right here to reach out on that table and to push rolls down in this up ender. Slate surface is one of them, the rolls won't roll, you usually have a guy stationed there to push the rolls down. So, he's leaning over this thing on this little accumulator table and he's shoving the rolls plum down in the up ender here. That's what that's called and when that clears – roll clears this up ender there, that's when they come up and the guys there are shoving the last roll cause, you know, sometimes if the filler is not right in the roll the rolls will get real soft and they won't roll. So, I've seen lots of instances where there's been a guy stationed there and we all know that so.

---

[3]  A copy of the video was admitted in evidence and viewed at the hearing.

On February 27, 2013, Employee was suspended because he violated four of Employer's safety policies. Employee was assessed 50 points for the following conduct: (1) 20 points for crossing the safety fence; (2) 20 points for blocking the electric eye with his hard hat; (3) 5 points for removing his hard hat; and (4) 5 points for throwing a wrapper and scrap piece of felt to the floor after dislodging the roll of felt. Employee was discharged on March 4, 2013.

At the hearing, Employee acknowledged that what he did to clear the jam violated Employer's safety rules. Employee testified that he was not "using his head," made "a bad choice," an "idiotic mistake" and "didn't ... intentionally" break the rules. Employee further testified that "[i]t's 2:30 in the morning or whatever, I've got upset conditions, I'm just trying to keep the lines going ...." This was the first time in 19 years of employment that Employee had violated a safety rule.

The Appeals Tribunal reversed the deputy's decision and concluded that Employee was not disqualified for unemployment benefits by reason of misconduct connected with work. The Appeals Tribunal found that:

> [Employee] knows that what he did on February 26, 2013, was contrary to safety policies of the employer. [Employee] knows that he should have entered the area through the safety gate, and shut down the machine before proceeding to dislodge the [roll] of felt. [Employee's] only thought was keeping the production line running. [Employee] had no prior rule violations of any kind throughout the nineteen years he worked for this employer.

The Appeals Tribunal therefore concluded:

> [E]mployer has not shown that [Employee] acted in willful disregard for the employer's safety rules, or the standards of behavior that the employer had a right to expect of an employee. [Employee] made a bad judgment call. His single act of indiscretion is not as a matter of law misconduct to disqualify him from receiving unemployment compensation.

6

Thereafter, Employer appealed to the Commission. The Commission affirmed the decision of the Appeals Tribunal and adopted its findings, except as supplemented below. The Commission explained:

> As the Appeals Tribunal pointed out, [Employee] had no history – during his 19 years of working for employer – of breaking employer's rules. [Employee] was "not the kind of guy that breaks rules ...." On the other hand, he was the kind of employee who tried to serve his employer's interests well by doing everything he could to keep its production lines moving.
>
> On the date of the incident that led to his discharge, [Employee] was working under pressure. He was having to keep two production lines moving instead of one. Machines were "messing up" on both lines. It was early in the morning, and he had been working a lot of hours. [Employee] testified that he was not "using his head," made an "idiotic mistake" that he never would have made again if employer had allowed him to keep working, and that he did not intentionally break employer's rules.
>
> Since [Employee's] work history supports his testimony regarding a lack of intent, we conclude that employer did not satisfy its burden of proving that [Employee's] behavior was the willful and wanton type normally encompassed within the definition of misconduct connected with work. Therefore, [Employee] should not be disqualified from the receipt of benefits under § 288.050.2 as a result of this work separation.

This appeal followed.

### Discussion and Decision

Employer contends the Commission erred in finding that Employee was not disqualified from receiving unemployment benefits. According to Employer, the evidence established that Employee was "discharged for misconduct connected with [his] work." *See* § 288.050.2. We disagree.

Pursuant to § 288.050.2, an employee is disqualified from unemployment compensation benefits when he or she is discharged for "misconduct" connected with the claimant's work. Section 288.030.1(23) identifies four separate categories of work-related behavior that qualify as "misconduct" for purposes of § 288.050.2:

7

[1] an act of wanton or willful disregard of the employer's interest,

[2] a deliberate violation of the employer's rules,

[3] a disregard of standards of behavior which the employer has the right to expect of his or her employee, or

[4] negligence in such degree or recurrence as to [a] manifest culpability, wrongful intent or evil design, or [b] show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer[.]"

§ 288.030.1(23) (bracketed numbers and letters added for clarity); *Seck*, 434 S.W.3d at 82; *see Ernst v. Sumner Group, Inc.*, 264 S.W.3d 669, 672 (Mo. App. 2008) (finding of misconduct under any one of the four definitions is sufficient to disqualify a claimant from benefits). "Each of the foregoing criteria for finding misconduct involves an element of intent or culpability." *Finner*, 298 S.W.3d at 583.

"Work-related misconduct requires a willful violation of the employer's rules or standards, and the violation must be intended." *Robinson v. Courtyard Mgmt. Corp.*, 329 S.W.3d 736, 740 (Mo. App. 2011); *Butrick v. Peterbilt of Springfield, Inc.*, 373 S.W.3d 473, 479 (Mo. App. 2012). "Willful is defined as '[p]roceeding from a conscious motion of the will; voluntary; knowingly, deliberate; intending the result which actually comes to pass; designed; intentional; purposeful; not accidental or involuntary.' BLACK'S LAW DICTIONARY 1599 (6th ed.1990)." *McClelland v. Hogan Personnel, LLC*, 116 S.W.3d 660, 666 (Mo. App. 2003). "To willfully disregard Employer's interests, Employee had to be aware of the requirement and knowingly or consciously violate it." *Id*. "A single instance of *intentional* disobedience of an employer's directive can constitute misconduct." *Finner*, 298 S.W.3d at 584 (emphasis added). Further, there is a "vast distinction" between the violation of a rule of an employer that would justify the discharge of the employee and a violation of such rule that would warrant a determination

8

of misconduct connected with the employee's employment so as to disqualify him for unemployment compensation benefits. *McClelland*, 116 S.W.3d at 665; *see Butrick*, 373 S.W.3d at 479. The determination of misconduct is dependent on the facts and circumstances of each case. *Richardson v. Division of Employment Sec.*, 361 S.W.3d 425, 430 (Mo. App. 2011); *see Barnes v. Jasper Products, L.L.C.*, 418 S.W.3d 530, 538 (Mo. App. 2014).

Employer contends it met its burden of showing misconduct under the first three of the four categories outlined above. Employee argues that Employee's actions: (a) willfully disregarded Employer's interests in employee safety; (b) deliberately violated Employer's well-established and reasonable safety rules; and (c) disregarded the clear standards of behavior that Employer expects and requires of all of its employees. Based upon this premise, Employer then argues that the facts found by the Commission do not support the award and/or the award is not supported by sufficient competent evidence in the record. We disagree with Employer's factual premise, and we will address each argument in turn.

First, Employer argues that Employee's actions were "willful" because Employee admitted, and the Commission found, that Employee knew "what he did on February 13, 2013, was contrary to the safety policies" of Employer. We disagree. To "willfully disregard" an employer's interests, an employee not only must be aware of the policy, but must "knowingly or consciously violate it." *McClelland*, 116 S.W.3d at 666. Here, Employee testified that he knew of the safety policies, but was not "using his head" and made an "idiotic mistake" in failing to follow the more recent safety policies and procedures. The Commission obviously believed Employee and made a factual determination that Employee's actions were not willful, and we defer to that that

9

determination. *See* § 288.210 RSMo (2000); **Seck**, 434 S.W.3d at 79; *see, e.g.,* **McCracken v. Branson Airport, LLC**, 352 S.W.3d 629, 630 (Mo. App. 2011) (Commission resolved conflicts in the evidence and decided which witnesses were credible; we defer to those factual determinations).

We similarly reject Employer's argument that because Employee knew the safety rules and "chose not to follow" those rules, he "deliberately violated" them. The term "deliberate" is defined as "[i]ntentional; premeditated; fully considered; ... [u]nimpulsive; slow in deciding." BLACK'S LAW DICTIONARY 459 (18th ed. 2004). Here, the evidence showed that Employee was working under pressure and made a quick decision, an impulsive response to clear the jam, reverting back to his previous training – certainly not "fully considered" as the definition requires. Further, a "deliberate" violation must be "intentional," requiring an employee not only has to be aware of the rule, but like willful behavior, "to knowingly or consciously violate it." **McClelland**, 116 S.W.3d at 666 (defining "willful" to include "deliberate" and "intentional" conduct). Here, there is ample evidence to support the Commission's finding that that Employee "did not intentionally break employer's rules."

In addition, with respect to "deliberate violation" of Employer's rules, Employer asserts the Commission improperly relied on Employee's "past history" of no prior rule violations of any kind in the 19 years he worked for Employer. Employer argues that the Commission placed "undue emphasis" on Employee's past history, which is "wholly irrelevant" because the "unsafe and rule-violating acts by [Employee] on February 26, 2013 were so egregious that they alone merited termination and constituted misconduct." Contrary to Employer's argument, past history is relevant to determining "misconduct" as defined by § 288.030.1(23) because the "criteria for finding misconduct involves an

10

element of intent or culpability." ***Finner***, 298 S.W.3d at 583; *see **Seck***, 434 S.W.3d at 83-84. Here, Employee's history of no prior rule violations in 19 years was relevant in determining Employee's lack of intent. The Commission's finding that Employee was "not the kind of guy that breaks rules" is supported by sufficient competent evidence, and tends to show that Employee did not deliberately violate safety rules. For this reason, Employer's reliance on several cases in which misconduct was found based on deliberate rule violations is misplaced because unlike this case, these cases involve repeated violations of employer's rules. *See, e.g.*, ***Fendler***, 370 S.W.3d at 590 (terminated after repeated violation of a known, understood and reasonable work rule); ***Butrick***, 373 S.W.3d at 475 (disciplined several times during employment with employer for his driving or issues relating to his driving); ***Finner***, 298 S.W.3d at 582 (terminated after three safety violations).[4]

Lastly, Employer argues Employee disregarded the "clear standards of behavior" that Employer expects and requires of all of its employees. Recently our Supreme Court in ***Seck*** clarified, however, that this particular category of misconduct is "restricted to those basic 'standards of behavior' that apply universally in the workplace" and generally "not included in the employer's express rules." ***Seck***, 434 S.W.3d at 83 (emphasis added). The Court explained:

---

[4] Employer also relies on ***Ernst v. Sumner Group, Inc.***, 264 S.W.3d 669 (Mo. App. 2008), which is distinguishable on other grounds. There, the eastern district of this Court concluded that the employee "deliberately violated" employer's computer usage policy by transmitting multiple "personal, frivolous and sexual" emails over time. The Court rejected employee's arguments that although employee was generally aware of the policy, the language of the policy did not "clearly prohibit the type of activity" in which he engaged, and "everyone else [was] doing it." *Id*. at 672-73. Neither argument applies here, where Employee fully acknowledged that he knew the safety rules at issue but made an "idiotic mistake" on the day in question, indicating that his actions were not deliberate.

11

> Unlike the second category, therefore, which applies only to violations of express rules of which the employee has been given notice, the third category applies only to those standards of behavior for which no such notice is needed because they are fairly understood by both the employer and the employee even where not included in the employer's express rules.

*Id*. Here, this third category does not apply because Employer has consistently maintained throughout these proceedings that Employee violated express safety rules and policies, all of which he had been given notice.

We further note that, according to the testimony of both Employee and Employer, Employee's actions in removing the jam in this case would have been appropriate, or even expected behavior, during the first 13 years of his employment. The fact that Employee reverted back to his prior training in an emergency does bear on our decision in this case, which is based only on the record before this Court. *See **Barnes***, 418 S.W.3d at 538. We emphasize that a determination of misconduct is dependent on the facts and circumstances of each case. *See id*.; ***Richardson***, 361 S.W.3d at 430.

In sum, contrary to Employer's various arguments, the Commission's determination – that Employee was not disqualified from receiving unemployment benefits because his discharge was not for misconduct connected with work, is supported by the facts, as found by the Commission, and by sufficient competent evidence in the whole record. Accordingly, we deny Employer's point and affirm the Commission's decision awarding unemployment benefits.


JEFFREY W. BATES, P.J. – OPINION AUTHOR

GARY W. LYNCH, J. – CONCUR

DON E. BURRELL, J. – CONCUR

12